MEMORANDUM FOR THE ATTORNEY GENERAL

Re: Appointees to the Civil Rights Commission and possible conflicts of interest.

Attached is the memorandum you requested on appointments to the Civil Rights Commission. I have left intact the last six pages in which a forceful argument is made against the appointment of a retired Supreme Court Justice, such as Justice Reed.

I think these pages state the arguments against such appointments very well, but I do not think they would be nearly so strong in fact as they appear in the memorandum. It might be that the appointment, while receiving considerable criticism, would meet with general approval in most parts of the country.

W. Wilson White
Assistant Attorney General
Office of Legal Counsel

# M E M O R A N D U M

Re: Appointments to Civil Rights Commission

A question has been raised whether appointments to the Civil Rights Commission may be made during the present adjournment of the Congress. It also has been asked what considerations, particularly those of a conflict-of-interest nature, are involved in the following appointments to the Commission: (1) An active state officer of one of the several states, (2) an officer of the United Nations, for example, Ralph Bunche, (3) an active Federal officer, e.g., an officer of the Department of Justice, (4) a retired Supreme Court justice, for example, Stanley Reed.

The Civil Rights Act of 1957, 71 Stat. 634, created in the executive branch a bipartisan Commission on Civil Rights, composed of six members to be appointed by the President with the consent of the Senate. Sec. 101. The duties of the Commission are to investigate allegations that certain citizens are being deprived of their right to vote because of color, race, religion or national origin; to study and assemble information concerning legal developments constituting a denial of equal protection of the laws; and to appraise the laws and policies of the Federal Government with respect to equal protection. Sec. 104(a). The

"The President shall have power to fill up all vacancies that may happen during the Recess of the Senate, by Granting Commissions which shall expire at the end of their next Session." (Art. II, Sec. 2, Cl. 3).

The Senate adjourned sine die on August 30, 1957. H. Con. Res. 229, 103 Cong. Rec. 15246, August 30, 1957. The adjournment marked the end of the first session of the 85th Congress. 103 Cong. Rec. 15290, D848. The present interval between the sine die adjournment of the Senate and its next regular session in January is a "Recess" within the meaning of Article II, Section 2, Clause 3 of the Constitution. This conclusion is supported directly by the opinion of Attorney General Knox in 23 Op. A.G. 599 (1901), holding that the period after the final adjournment of the Congress for the session and before the next session begins is "the Recess" during which the President shall have power to fill a vacancy under Article II, Section 2, Clause 3.

The Civil Rights Commission came into existence during the present Senate adjournment on September 9, 1957, upon approval of the Civil Rights Act of 1957 by the President. The office of an additional assistant attorney general was created by the same act and came into existence at the same time. With respect to the latter office the opinion was expressed

- 3 -

Commission is required to submit reports to the President and to the Congress, and its final report and recommendations must be submitted not later than two years from the date of enactment of the act. Sec. 104(b). Sixty days thereafter the Commission shall cease to exist. Sec. 104(c).

Members of the Commission, except those otherwise in the service of the United States, shall receive compensation at the rate of $50 per day for each day spent in Commission work. All members shall be reimbursed for expenses. Sec. 103.

In carrying out their duties the members will be assisted by a full-time staff director and other necessary personnel. Sec. 105(a). The Commission may establish advisory committees, Sec. 105(c), conduct hearings and issue subpoenas for the attendance of witnesses and the production of documents, Sec. 105(f). Detailed rules of procedure are provided in section 102. Members of the Commission are exempted from sections 281, 283, 284, 434, and 1914 of title 18, United States Code, and section 99 of title 5 -- the so-called conflict-of-interest statutes. Sec. 105(d).

## Recess Appointments

The Constitution gives the President power to make recess appointments in the following terms:

- 2 -

in Assistant Attorney General White's memorandum to the Attorney General of September 5, 1957, that the President has authority to make a recess appointment to an office which comes into existence during the recess of the Senate. Therefore, the memorandum concluded, the President has the constitutional power to make a valid recess appointment to the office of assistant attorney general. There would appear to be nothing in the nature of the office of a member of the Civil Rights Commission which would require a different conclusion. The bill itself contains no impediment to the making of a valid recess appointment, and examination of the legislative history of the act suggests no reason for considering the making of a recess appointment during the present adjournment to be legally objectionable/1/. It is concluded,

##FN1

1/ Apart from the question of legal authority, policy considerations might make such appointments questionable in view of the political controversy which is likely to surround any appointments to the Civil Rights Commission. For example, Senator Stennis, while recognizing that the law "apparently" would permit recess appointments to the Commission, observed:

"If the bill should become law, I point out that the entire spirit of it, if not the letter, absolutely requires that the Senate be given an opportunity to consider the nominations before the members of the Commission actually undertake to discharge the vast powers and responsibilities vested in them in the bill." 103 Cong. Rec. 14854 (August 28, 1957).

therefore, that the President may constitutionally make recess appointments to the Civil Rights Commission. For the reasons stated in the September 5, 1957 memorandum it is also concluded that the provisions of 5 U.S.C. 56 would not prohibit the payment of a per diem to a recess appointee to the Commission.

## Conflict-Of-Interest Statutes

Section 105(d) of the act expressly exempts members of the Commission from the operation of sections 281, 283, 284, 434 and 1914 of title 18, United States Code, and section 99 of title 5. These are the conflict-of-interest statutes applicable generally to all officers and employees of the United States. Accordingly, because of the exemption, no question is raised as to whether these statutes would apply to members of the Commission. However, section 103 recognizes that persons may be appointed to the Commission who are "otherwise in the service of the Government of the United States." It would appear that any such person who is otherwise subject to the conflict-of-interest statutes would continue to be subject to these statutes, notwithstanding his appointment to the Commission, unless he should resign from his other Federal employment. Of course, this

- 5 -

conclusion is not free from doubt since the statutory exemption applies to _all_ members of the Commission. However, the legislative history of the bill contains no indication that the exemption was specifically intended to cover a member who was subject to the conflict statutes by virtue of other Federal employment. Moreover, the usual purpose of the inclusion of such exemptions in legislation creating commissions of limited duration is to induce persons to serve who, but for the exemption, would refuse to do so because of concern that the conflict statutes would too severely limit their private activities. Such a purpose is obviously inapplicable to regular Federal officers and employees who would accept appointment to the Commission in addition to their normal Government duties. The legislative history of the act, while not indicative of the precise purpose of including the exemption, supports the conclusion that the exemption was incorporated for the usual reasons that it is included in legislation creating similar commissions or organizations. In any event, whatever the precise legal effect of the exemption, any appointee otherwise subject to the conflict-of-interest statutes by virtue of other Federal employment, should

- 6 -

continue to consider himself subject to them.

## 13 Hatch Act

Section 9(a) of the Hatch Act (5 U.S.C. Supp. IV (1952 ed.) 1181) prohibits officers and employees in the executive branch from taking an active part in political management or in political campaigns. The same section of the act excepts from this prohibition certain persons including "officers who are appointed by the President, by and with the advice and consent of the Senate, and who determine policies to be pursued by the United States . . . . in the Nation-wide administration of Federal laws." It appears that a member of the Civil Rights Commission would come within this exception and would be permitted, therefore, to participate in political activities.

Members of the Commission are appointed by the President with the advice and consent of the Senate. Sec. 101(b). Members of the Commission also determine policies to be pursued by the United States in the Nation-wide administration of Federal laws. The provisions of the Civil Rights Act which the Commission administers are national in scope. For example, the duties set forth in section 104 contain no territorial limitation within the United States, and the

Commission is empowered to hold hearings at such places as the Commission deems advisable. Sec. 105(f). Moreover, the members of the Commission will determine policies in the administration of those provisions of the act which pertain to it. The Commission's duties, for example, are outlined in extremely general terms. The Commission necessarily will be required to make a significant policy decision in determining the scope of its duties under this section. The procedural rules to guide the Commission in section 102 require in several instances the exercise of discretion. For example, it is for the Commission to decide whether it will permit witnesses to submit written statements. Sec. 102(h). The Commission also is the sole judge of the pertinency of testimony and evidence. Sec. 102(h). Additionally, the Commission has complete discretion in deciding what evidence or testimony taken in executive sessions will be released to the public. Sec. 102(g).

For the foregoing reasons it seems clear that the members of the Commission are within the named exception to the political activities prohibition of the Hatch Act. A question may arise as to any member of the Commission who also may be a regular officer or employee of the Government. The problem here is different than with respect to the

exemption from the conflict-of-interest statutes. A Commission member who also is a regular officer of the United States in some other capacity certainly would not be hampered in the effective discharge of his duties if he were subject to the conflict-of-interest laws. On the other hand, the same member may be handicapped in the discharge of Commission duties if he is subject to the Hatch Act political activities restrictions. Policy-making officials were exempted from the Hatch Act in recognition of the fact that effective service in such positions required that they be able to support through active political participation those policies which they helped to make. See Assistant Attorney General Rankin's memorandum of June 15, 1954, to the Attorney General concerning "Application of the Hatch Act to Top Government Executives," particularly statements of Senator Hatch quoted on page 2 and Congressmen Healey and White, on page 3. It, therefore, would seem entirely consistent with the purposes of the Hatch Act exemption of policy-making officials that a member of the Commission who, by virtue of other Government employment, may be subject to the Hatch Act political activities restrictions, should be exempted from those prohibitions. It may be desirable to clarify by legislation the status

- 9 -

of such a member under the Hatch Act. The problem would not arise, of course, with respect to an officer of the Government named to the Commission who already is exempt from those restrictions, as, for example, the Deputy Attorney General or an Assistant Attorney General.

## Active State Officer

The appointment to the Commission of an active state officer would involve a possible violation of Executive Order No. 9 of January 17, 1873, which, with certain specific exceptions, prohibits persons from accepting or holding any office or position under a State, Territorial, or municipal government at the same time that they hold Federal civil office by appointment. Continued holding of a state office by a Federal appointee is deemed a vacation of the Federal office. The Commission on Civil Rights was created in the executive branch (Sec. 101(a)), and a member of such Commission holds a civil office by appointment. Thus the order is clearly applicable. /2/

It has been ruled that the Order would prohibit appointment to Federal office of the Treasurer of the City

2/ Although it might be argued that Executive Order No. 9 was not intended to be applicable to an office, such as that of a member of the Civil Rights Commission, established by an act which does not require the incumbent to devote a

- 10 -

of Philadelphia and of the Mayor of New York. Opinion of Acting Attorney General Biddle to the President, June 14, 1941, 11 Unp. Op. 479. Many exceptions to the Order have been made by subsequent executive orders in favor of specified Federal employments and named officers. For example, officers and employees of the United States Atomic Energy Commission may hold state or local offices under certain circumstances (Executive Order of March 15, 1949). The 1873 order and a summary of the Federal offices excepted therefrom are set forth in Civil Service Pamphlet 20, January 1956, at pages 19 through 24.

If it is desired to name to the Commission a state officer whose state service does not come within the exceptions listed in the original order as amended, he would be unable to serve on the Commission unless expressly authorized by executive order or act of Congress. /3/ A determination by the President that service on the Commission

Foot Note 3 Cont'd

requires a minimum amount of time to the office, such an intent is not expressed in the Order, which refers simply to "persons holding civil office by appointment." It is not, by its terms, limited to full-time positions. Compare Attorney General Bonaparte's opinion to the President that the appointment of the Commissioner of Labor as a member of the Immigration Commission established by statute to investigate the subject of immigration was not an appointment to an "office" within the meaning of a dual compensation law. 26 Op. A.G. 247 (1907).

/3/ C.S.C. Pamphlet 20, p. 24 states that the "heads of a number of Federal agencies are authorized by specific statutes to employ the services of State and local officers."

FN3

- 12 -

of an active state officer would not interfere with the effective discharge of his Federal duties and responsibilities would appear to be sufficient justification for the issuance of an executive order excepting such official from the prohibition of Executive Order No. 9. As Attorney General Wickersham explained in 30 Op. A.G. 75, 78:

"The evil at which the order was aimed was the interference with public duties necessarily entailed in actively discharging the functions of two offices, and not any theoretical incompatibility in serving two masters." (Underscoring supplied).

Aside from the Federal limitation upon dual employment, state constitutional and statutory provisions may prevent the state officer from assuming Federal office. A prospective appointee should determine whether any such provisions would apply to him.

## Officer of the United Nations

Appointment to the Commission of an officer of the United Nations, for example, Ralph Bunche, probably would require that he resign from the United Nations. It is understood that Mr. Bunche is an Under Secretary without Department, a member of the Secretariat of the United Nations.

Pertinent to a consideration of Mr. Bunche's status is Article 100 of the United Nations Charter, which provides as follows:

- 12 -

"1. In the performance of their duties the Secretary-General and the staff shall not seek or receive instructions from any government or from any other authority external to the Organization. They shall refrain from any action which might reflect on their position as international officials responsible only to the Organization.

"2. Each Member of the United Nations undertakes to respect the exclusively international character of the responsibilities of the Secretary-General and the staff and not to seek to influence them in the discharge of their responsibilities."

Also of interest are the following provisions of the United Nations Staff Rules, ST/SGB/94/Rev. 4, New York, 1955:

"Regulation 1.1: Members of the Secretariat are international civil servants. Their responsibilities are not national but exclusively international. By accepting appointment, they pledge themselves to discharge their functions and to regulate their conduct with the interests of the United Nations only in view.

"Regulation 1.4: Members of the Secretariat shall conduct themselves at all times in a manner befitting their status as international civil servants. They shall not engage in any activity that is incompatible with the proper discharge of their duties with the United Nations. They shall avoid any action and in particular any kind of public pronouncement which may adversely reflect on their status, or on the integrity, independence and impartiality which are required by that status. While they are not expected to give up their

national sentiments or their political and religious convictions, they shall at all times bear in mind the reserve and tact incumbent upon them by reason of their international status.

"Rule 101.6(a): Staff members shall not engage in any continuous or recurring outside occupation or employment without the prior approval of the Secretary-General.

"Regulation 1.6: No staff member shall accept any honour, decoration, favour, gift or remuneration from any Government excepting for war service . . . .

"Regulation 1.7: Staff members may exercise the right to vote but shall not engage in any political activity which is inconsistent with or might reflect upon the independence and impartiality required by their status as international civil servants."

It is doubtful that appointment to the Civil Rights Commission would be consistent with the obligations of Mr. Bunche as an international civil servant. It is certain that the work of the Commission will be controversial and involved in partisan politics./4/ Furthermore, service on

/4/ During the debates on the bill which became the Civil Rights Act of 1947, Senator Thurmond referred to "this political Commission." 103 Cong. Rec. 14679, August 27, 1957. Senator Eastland said the Commission will "be used as a means of exploiting so-called minority groups for political purposes," and referred to "political machinations within the Commission." 103 Cong. Rec. 14858, August 28, 1957. Congressman Dorn said that the Commission would be

Foot note 4 contd on next page

- 14 -

the Commission presumably will involve an appreciable expenditure of time. The political implications of service on the Commission may reflect on the impartiality and independence of Mr. Bunche as an international civil servant. His duties on the Commission may interfere with his duties to the United Nations. Moreover, the receipt of compensation from the United States in connection with his service on the Commission would appear to be directly violative of Regulation 1.6 of the United Nations Staff Rules, and since the Civil Rights Act requires that each member of the Commission "shall receive" a certain per diem, it would not be consistent with the expressed intent of the Congress to permit Mr. Bunche to waive this compensation. /5/

It also should be considered whether United Nations employment would be consistent with Mr. Bunche's obliga-

FOOT NOTE 4 cont'd

involved in the 1960 presidential election. 103 Cong. Rec. 14698, August 27, 1957. Congressman Abbitt said the Commission "will be a sounding board for socialistic groups." 103 Cong. Rec. 14701, August 27, 1957. Congressman Selden observed that the "only required qualification for membership on the Commission is political." 103 Cong. Rec. 14705, August 27, 1957.

5/ See 7 Unp. Op. 1096 (1937). See also 31 Comp. Gen. 505, 507 (1952).

tions as an officer of the Civil Rights Commission. Article I,
Section 9, Clause 8 of the Constitution provides that no
person holding any office of profit or trust under the United
States shall without the consent of the Congress accept any
emolument or office of any kind whatever from any "king,
prince, or foreign state." Because constitutional provisions
must be viewed in their broad intendment, and because inter-
national organizations like the United Nations were unknown
to the period in which the Constitution was written, the
question might properly be asked whether the United Nations
is within the class specified by Article I, Section 9, from
whom office or emolument may not be accepted by an officer
without the consent of the Congress. Assistant Attorney
General Rankin's memorandum to the Attorney General of
November 27, 1953, re "Membership of Judge Parker on the
International Law Commission" considered this question with
reference to service on the Commission. The conclusion was
reached that the United Nations is not a "foreign state"
and that service on the Commission is not subject to nor
violative of Article I, Section 9, Clause 8 of the Consti-
tution. In reaching this conclusion, however, the memo-
randum emphasized that in "relationship to the constitutional
prohibition, there is nothing in membership on the Inter-
national Law Commission comparable to accepting an office

- 16 -

from a foreign government and all that it implies." On the other hand, employment by the United Nations Secretariat does contain elements comparable to accepting an office from a foreign government. For example, a member of the Secretariat takes an oath of loyalty to the United Nations (Regulation 1.9), pledges himself to discharge his functions and regulate his conduct with the interest of the United Nations only in view (Regulation 1.1), receives a salary from the United Nations (an Under Secretary receives $18,000 a year), is subject to the authority of and is responsible to the Secretary-General (Regulation 1.2), and is characterized as an international civil servant of the United Nations (Regulations 1.1 and 1.9). In short, a member of the Secretariat has duties and responsibilities to the Organization comparable to those which he would owe as an officer or employee of any government. Accordingly, there is some basis for regarding United Nations employment as coming within the spirit if not the letter of the prohibition of Article I, Section 9, Clause 8 of the Constitution.

Apart from the constitutional consideration, service as a member of the Civil Rights Commission and as a member

- 17 -

of the United Nations Secretariat might present actual conflicts of interest with respect to the subject of civil rights, which is a matter of interest also to the United Nations. It is conceivable that a member of the Civil Rights Commission might adopt a view with respect to civil rights inconsistent with a United Nations position on human rights. The possibility of such a conflict might fetter the independence of judgment to be expected of a member of the Civil Rights Commission.

Thus, although the appointment of Mr. Bunche to the Civil Rights Commission would not be clearly illegal or unconstitutional as a matter of United States law should he continue as a member of the United Nations Secretariat, the foregoing considerations suggest that the appointment would be of questionable propriety. Of course, Mr. Bunche also would have to seek the views of the United Nations as to the propriety of the dual appointment under the United Nations Charter and regulations.

### Active Federal Officer

The appointment to the Civil Rights Commission of an active Federal civilian officer, [6]/ such as an officer of

[6]/ It is assumed that an officer of the armed forces would not be appointed to the Commission. Such an appointment would involve considerations other than those discussed.

the Department of Justice, would seem to present no legal objections. Section 103(b) of the Civil Rights Act recognizes that persons concurrently serving the government may be appointed to the Commission by providing that no compensation shall be paid to any member "who is otherwise in the service of the Government of the United States." This provision thus requires that a person who is appointed to the Commission, while retaining another Federal position, shall not receive compensation for his service to the Commission. Thus, section 2 of the Act of July 31, 1894, as amended (5 U.S.C. 62), which prohibits a person holding an office the salary of which is at least $2,500 from accepting any other office to which compensation is attached, is not applicable. This section has been construed as not preventing dual office holding where no statutory compensation is attached to the second office. 14 Unp. Op. 48, 58. See also 34 Op. 490 (1925).

Agency regulations also would have to be taken into account in the appointment of an active Federal officer. For example, Order No. 46-54 of the Attorney General limits the outside activities of officers or employees of the Department of Justice. Other considerations pertinent to

the appointment to the Commission of an officer already in the service of the United States have been discussed with reference to the Hatch Act and the conflict-of-interest statutes.

### Retired Supreme Court Justice

Appointment to the Commission of a retired Supreme Court Justice, such as Justice Stanley Reed, would not be objectionable legally and is supported by precedent. However, policy considerations relating to the propriety of members of the judiciary serving in executive branch positions are relevant to such an appointment.

There is no express prohibition against Federal judges performing other services of a general character for the Federal Government. 40 Op. A.G. 423 (1945). There have been many instances of Federal judges accepting appointments to special commissions without vacating their judicial offices or violating other provisions of law. See 40 Op. 423 and precedents cited therein. The Civil Rights Commission is an investigatory agency with powers of recommendation. Its functions and the duties of its members would not appear to raise any legal impediments to service by a member of the judiciary. [7]

---

[7] 28 U.S.C. 454 makes it a crime for a Federal judge to engage "in the practice of law." Private law practice probably is meant. However, membership on the Civil

Foot note 7. contd on next page

- 20 -

Justice Reed retired under the provisions of

28 U.S.C. 371(b), which provides as follows:

"Any justice or judge of the United
States appointed to hold office during
good behavior may retain his office but
retire from regular active service after
attaining the age of seventy years and
after serving at least ten years contin-
uously or otherwise, or . . . . He shall,
during the remainder of his lifetime,
continue to receive the salary of the
office."

As a retired associate justice of the Supreme Court he may

be "designated and assigned by the Chief Justice of the

United States to perform such judicial duties . . . as he

is willing to undertake." 28 U.S.C. 294(a).

Since Justice Reed, although presently inactive,

retains his office, continues to receive the salary of

that office and may be recalled to active duty with his

consent, it would appear that he is "otherwise in the

service of the United States" and, therefore, under the

terms of section 103(b) of the Civil Rights Act, would be

required to serve on the Commission without compensation.

Thus, those statutes that prohibit a Federal officer from

receiving dual compensation are not applicable. See Act

Rights Commission would not constitute the
practice of law in any sense. See in general memorandum
from Assistant Attorney General Rankin, to the Deputy
Attorney General on "Practice of Law by Federal Judge,"
July 6, 1956.

- 21 -

of May 10, 1916, as amended (5 U.S.C. 58) 8/ and section 2 of the Act of July 31, 1894, as amended (5 U.S.C. 62).

Apart from legal considerations, the appointment of a member of the judiciary to an executive branch office is doubtful as a matter of policy. Perhaps the most outspoken opponent of extra-judicial work by Federal judges was Chief Justice Stone. His opinions on the subject are set forth in an article by Alpheus Thomas Mason, entitled "Extra-judicial Work for Judges: The Views of Chief Justice Stone," 67 Harvard Law Review 193-216. His chief concern, apart from the loss of manpower, was that such activities might become subject to review by the court or have political implications and consequences which should be wholly dissociated from the judicial office. See, e.g., Chief Justice Stone's letter to President Roosevelt declining to serve on a commission to study the Rubber Industry during the war. 67 Harv. L.R. at 203.

The undesirable results stemming from the appointment of Federal judges to extra-judicial duties or functions in the executive branch have been listed as follows in a report of the Senate Judiciary Committee published in 33 A.B.A. Jn. 792, 795 (August 1947):

##FN8

8/The Comptroller General has ruled that payment of retirement salary to a judge of the Municipal Court of Appeals of the District of Columbia and the compensation attached to some position or office with the Federal Government would be precluded by this statute. 31 Comp. Gen. 505, 507 (1952).

- 22 -

1. Reward may be conferred or expected in the form of elevation to a higher judicial post.

2. The judicial and executive functions may be improperly merged.

3. The absence of the judge from his regular duties increases the work load of the other judges of the court, if any, and may result in an impairment of judicial efficiency in the disposition of cases.

4. Non-judicial activities may produce dissension or criticism and may be destructive of the prestige and respect of the Federal judiciary.

5. A judge upon resumption of his regular duties may be called upon to justify or defend his activities under an executive commission.

In considering whether any of these objections are applicable to a retired Supreme Court justice, it is important to consider the terms of retirement. Justice Reed, for example, is retired under a statute providing that he shall retain his office as an associate justice and receive the salary thereof. With his consent he may be assigned by the Chief Justice to judicial duties.

The first objection listed in the Senate report would not be applicable to a retired justice of the Supreme

Court. Applicability of the other objections would depend largely upon whether the justice has withdrawn irrevocably from the bench or whether he may resume judicial functions upon termination of his duties in the executive branch. If the former, then he in reality is no longer so identified with the judicial branch that his extra-judicial activities would be properly subject to these criticisms. If, however, the retired justice may resume his judicial activities, then the enumerated considerations would be applicable, at least to a degree. Moreover, it is arguable that one objection — that non-judicial activities may produce dissension or criticism and may be destructive of the prestige and respect of the Federal judiciary — would be pertinent even though the retired justice did not resume judicial functions after executive branch service. The reason would be that a retired justice may continue to be identified in public mind with the Supreme Court and this identification may, therefore, tend to subject the Court itself to criticism of his acts in the executive branch.

On at least two occasions the Office of Legal Counsel has indicated that the propriety of service by Federal

judges in non-judicial capacities is not to be supported on the ground that the judge is retired. In both instances reference was made to the resolution of the Judicial Conference in 1942 against Federal judges serving as arbitrators for the National War Labor Board. The resolution was cited in Assistant Attorney General Rankin's letter of December 16, 1953, to Mr. Emett C. Choate, who had inquired whether a retired Federal judge might accept a position as a paid chairman in arbitration proceedings between the Pressman's Union and the Miami Daily News and Miami Herald. While no opinion was expressed on the legal aspects of the problem, Mr. Rankin observed that the Office of the Director of the Administrative Office of the United States Courts had advised that the above precedent reflected the present attitude of the Judicial Conference on the general subject of Federal judges accepting appointments as arbitrators and was a policy equally applicable to retired judges. Recent inquiry confirms that this is still the attitude of the Judicial Conference. The 1942 resolution also was cited in Assistant Attorney General Rankin's memorandum of July 6, 1956, to the Deputy Attorney General concerning practice of law by a retired Federal judge.

Appointment of a member of the Supreme Court, whether active or retired, to the Civil Rights Commission undoubtedly would arouse far more controversy than any previous appointment of a member of the Judiciary. Whereas criticism of such appointments in the past appears to have come largely from the bench itself, the intense political controversy which engendered the Civil Rights Commission probably will result in unusual public scrutiny of all appointments thereto. Any appointment the propriety of which may be in the least doubtful may be expected to stir a tide of public criticism. In the case of the appointment of a member of the Supreme Court, the criticism undoubtedly would be greater because of the recent role of the Supreme Court in connection with civil rights, particularly in the area of school integration, a subject which is within the investigatory duties of the Commission. Here the blending of executive and judicial functions might well be subjected to heated political and public discussion in the case of Justice Reed, who was an active member of the Supreme Court at the time of the school integration decision.

Another reason for doubting the present propriety of appointing members of the judiciary, including retired

judges, to service in the executive branch is the urgent need of more Federal judges to speed up the processes of Federal justice. As recently as March 1957, the Judicial Conference recommended the creation of 42 additional judgeships. /Report of the Proceedings of a Special Session of the Judicial Conference of the United States, March 14, 15, 1957, pp. 2-4/. Since Congress did not create any additional judgeships during its 1957 session, it may be concluded that the Judicial Branch is presently understaffed. It is, therefore, questionable whether a retired Federal justice who by law is eligible to be assigned judicial duties and who retains his office and salary for life should be appointed to an office in the executive branch since such appointment may result in his becoming unavailable for judicial assignment.

The applicability of Canon 28 of the Canons of Judicial Ethics of the American Bar Association also should be considered. This canon provides in part that a judge should not engage generally in partisan politics. As indicated above in connection with the Hatch Act exemptions of policy-making officials, a member of the Civil Rights Commission is a policy-making official the effective discharge of whose duties may require political participation. Also, members of the Commission must be

appointed with regard to political affiliation, Sec. 101(b). Of course, it is conceivable that a Commissioner may regard his appointment as non-political and may carry out his duties without partisan political participation.

In any event it would seem appropriate to seek the views of the Chief Justice before any action is taken with respect to a member of the Supreme Court. Although President Truman did not consult Chief Justice Stone before naming Justice Jackson as American Prosecutor at the Nuremberg War Crimes Trials/9/, it is known that the Chief Justice was disturbed by the appointment, which he considered improper.

---

9/ The Chief Justice did not know of the appointment until he read of it in the newspapers. 67 Harv. L.R. 193, 209, 210.